The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning, counsel. Our first case for today is 2019-1728, James Talcott Construction v. United States. Mr. Meacham, please proceed. Thank you, your honor. As you are familiar with the briefing, this case is about construction at some housing units at Malmstrom Air Force Base in Great Falls, Montana. During the course of construction, mold was found in the crawl spaces. I think it's important for the panel to understand what a crawl space is and how it's isolated from the occupied and living spaces. A crawl space is an area under the living unit which houses plumbing, HVAC ducts, and that type of thing. Mr. Meacham, excuse me, this is Judge Lynn. Am I correct that the crawl space is a sealed space, sealed from the outside environment, but when in the finished unit, it is mechanically ventilated by the HVAC system? It is not sealed from the outside. It is sealed between the crawl space and the living unit. Between the crawl space and the outside, there are gaps in the framing and so forth. The way this system was designed is that air from the HVAC system would not heat the crawl space, but minor amounts of air would be pumped into the crawl space. Then that air that was pumped in would create a pressure that would then push air to the outside, not up into the living unit. So, there is ventilating air that is mechanically pumped in during normal operation, but there are no deliberate vents in the structure to the outside? There are no deliberate vents in the structure outside. That is correct. Alright. So, the system was designed to have that air filter out because there are minor portions of air. When you talk about ventilation, it is not a significant amount. There are minor when the system is in operation. There is enough air circulating to prevent the buildup of mold? That is correct, once it is in operation. So, the issue here is mold that may develop during the course of construction? That is correct. Alright. Thank you. So, all of the areas to the living space are areas that are sealed off. The specifications were clear that after the first floor framing was installed, which includes the joist and the flooring system, which is a tongue and groove flooring, once a penetration was put in the floor to prevent any air from flowing into the first floor, that area was to be sealed. Even the duct work, you mentioned the ventilation system, even the duct work that passed through the crawl space was to be a seamless material or to be tightly sealed. They did not want any air coming from the crawl space into the living area. And as mentioned in the brief, those areas, even though they receive minor amounts of air, they are deemed to be unheated areas and unconditioned areas. Now, as it relates to mold, the mold is not regulated by the EPA. There were no specifications within the contract that indicated there were limitations on mold that would be found on rough framing materials, which were those materials that were in the crawl space. Now, the contract is not silent on mold. The contract recognizes that mold can grow on organic material. And so, in those living spaces, the contract was very clear that if there is mold found on the finished carpentry, cabinets, drywall, those type of organic surfaces, that the mold was to be removed. However, in regards to the rough framing and the crawl space, there was no such specification. The contract did not require the contractor to perform any Mr. Meekham? Yes. This is Judge Chen speaking. There was some provision incorporated into the contract, wasn't there, that the contractor would need to do some mold remediation if it was discovered in large quantities or unhealthy amounts, I guess to protect the employees during the construction? No, Your Honor, that is not the case. What the reference is, is there is a reference to EMT-385. EMT-385 is in relationship to the safety of the occupants of the building. Now, EMT-385 refers specifically to indoor air. And indoor air under ASRA is defined as those areas that are in occupiable spaces. Mr. Meekham, this is Judge Lynn. What makes you say that the indoor air quality, as used in EMT-385, is defined by the ASRA definition? In other words, why does that definition apply? Because EMT-385 specifically refers to ASRA in that provision of the specifications of EMT-385. EMT-385 refers to the indoor air quality. It refers to the ASRA specifically in regards to how that is to be applied. And then when you go to the ASRA, the ASRA is very specific in talking about what is an enclosed, occupiable area. And indoor air is defined as... Where is the reference to ASRA in the EMT-385? I'm trying to find it. Yes. Let me... If you go to Appendix 8331, it talks about an industrial hygienist or other qualified under 6K01 investigations. Industrial hygienist, other qualified and air quality investigation using appropriate guidelines published by... And it talks about ACGIC and then the refrigeration and air conditioning engineers. That is ASRA. And so those are the standards that are to be used. None of these other standards that are in there discuss that issue. And so the ASRA is the standard. And in fact... Mr. Mecham? This is Judge Chen. I see a construction log at 829.57 where JTC on January 5th, 2011 indicates that mold was found in the crawl space of Building 620. We are proceeding per EM-38506.K.03. That is correct. So it seems... I mean, just to let you know what I'm thinking here, it appears to me that JTC understood that this EM-385 provision had some kind of requirement and obligation it needed to follow if something were to occur and that something would be this mold that was found in the crawl space. And it immediately understood and invoked this EM-385 provision. That is correct. And so because that area was an enclosed area that had workers, what they did is they went in and they had someone come in and look at the area. They did a review of that. And by February, they had people back in the area working. So that was a safety issue in regards to the workers. So the workers, what they did is they wiped things down and they went back in and they commenced working. Now, what the government required was significantly more than that. So in regards to the safety provision, if you review all of the documents, JTC at that point, the only thing that it could find in regards to mold was EM-385. It had someone come in, they looked at the mold, they were able to occupy it. The government, if you look at the entire scope of the government's documents, at no time did the government indicate to JTC that you are required to remediate this mold and perform this remediation activity and certification in accordance with EM-385. It was later determined that 385 was not applicable. It was only applicable to indoor air. But on the initial finding of the mold, there was a determination made that we should come in, have someone come in and look at this and make that evaluation. It was then, subsequent to that, in January of 26, where the government then issued their letter where they specifically said, and you'll see in that letter dated January 26, there is absolutely no reference to EM-385. The government's directive was based upon the FAR clause, 52-336-9, Protection of Existing Vegetation, Structures, etc., which was found to be not applicable because this was new construction. It was not existing construction. Mr. Mason, would you like to save the remainder of your time for rebuttal? Yes, I will. Very good. Then let's hear from the government. Please proceed. May it please the Court. The Court should affirm the judgment in favor of the United States dismissing the complaint because Talcott simply re-arguing factual propositions that were correctly projected by the trial court after its nine-day trial in Seattle where it heard from 15 witnesses, three of whom were experts, who talked about some 252 exhibits. Even if Talcott is successful in overcoming any legal finding here, it was still running to a finding of facts which it simply can't overcome. As you just heard from our colleague, Steve Mecham, this case concerns the replacement of military housing at the Malmstrom Air Force Base. Ms. Acevedo? Yes. Am I pronouncing your name correctly? You are correct, yes. Okay, great. Ms. Acevedo, I heard Mr. Mecham say something about how the presence of mold in the crawl space would be absolutely irrelevant to any occupant of the home because, as I recall, no mold in the crawl space ever goes up into the house. And so, even if there's something incredibly noxious or mold or something like that, there really isn't any concern. And so, you can't say that mold, even if it's grass-like growing all over the place in the explain what, if anything in the record, refutes that? Certainly. The testimony of their own mold expert, who was a fact expert, not a traditional expert, Mr. Keith Kron. Kron, incidentally, is spelled with a C, not a K, found at page 15407, refutes that. Crawl spaces, the crawl spaces are semi-conditioned crawl spaces, and they provide heat to the home. HVAC air is introduced into the crawl space, but the crawl spaces are not airtight. They are designed to leak air. Otherwise, it would be like a balloon, right? Air has to leak from the crawl space. So, the crawl space air would leak up into the rest of the home, and it would be carried by the HVAC air to the entire home. So, I asked Mr. Kron if it was his opinion that the introduction of conditioned air into the crawl space would result in air from the crawl space being circulated to other parts of the house, and he said, correct. And that is also backed up by the testimony of our expert, Mr. Jeffrey Peters, which is down at page 16585, and Talcott himself acknowledged that the crawl space is not airtight, so that the air that's introduced by the HVAC that is then released to the house. So, that is 15449. Okay, thanks. Addressing the constructive change claim first. Talcott raises three claims, one for constructive change, one for a breach of contract based on a purported implied warranty of specifications, and a third for damages. On the constructive change claim first, taking that one now, they have to prove two things. They have to show that they performed work that was outside the contract, and they have to show that they did that at the direction of the government. So, the trial court correctly held, obviously, that homes with what it described to be a vast amount, substantial, and pervasive mole growth did not comply with the contract expectation that the work be conducted in a skillful and workmanlike manner, and that it be warrantied from defects. It found that that amount of mold, which it said was covered floor joists, decking, walls, grade beams, and appeared grass-like in the soil, was a material defect. But even if that legal conclusion... Counsel, this is Judge Moore. Is it true that other properties were also similarly infested with all of this mold, other properties not being built by JTC? So, it is true that there were several phases of construction, that during other phases of construction, mold was encountered during the construction phase. However, if you look at the place that's cited for that, and I believe it is... If you'll give me just one moment. I'm looking for the... I think it's... I'm looking for the site here. If that mold... I think it's 9552 to 9553. That mold was not the same type of mold. The trial court heard a lot of testimony about that. It was spotty mold. It was not the same... This was pervasive, substantial, and vast amount of mold. It was not the infestation that we see here. It was an occasional siting of mold. But in any event, in those circumstances, if you look at the documents that cited in support of that, there the contractors accepted responsibility for the means and methods that caused the mold, and none of them submitted a claim or an REA in connection with it. I guess I'm not certain why that necessarily weighs in favor of the government. I mean, you know, the government is the giant in the room. The fact that the other contractors decided to just remediate and not go after the government for payment based on it being a design flaw, it doesn't seem to me to make it clear that it's not, in fact, a design flaw. If basically everyone was encountering the same problem, and if they were using the government's designs, isn't this a design contract then? It's not a design contract, because as the trial court correctly held, the contract contains performance requirements, and in making that holding at page 6 of its opinion, it relied on notes 2 and 3 of the general structural notes, which state, quote, unquote, the contract structural drawings and specifications represent the finished structure. They do not indicate the method of construction. But in any event, TLCOT cannot prevail on its claim for design specification, because it cannot overcome the trial court's factual findings that what caused the mold was its sequencing of construction in enclosed and saturated spaces, crawl spaces, without taking any measures to dehumidify, ventilate, or otherwise dry them out, and not any purported reliance on an alleged defective specification. Ms. Acevedo, this is Judge Chen again. Sure. My understanding is one significant cause of the degree of mold in this particular circumstance is the choice to not lay down the plastic vapor barrier, I guess, until several weeks or a few months after everything else regarding the floor had been assembled and sealed off. Do you know if those other prior home constructions by other contractors also chose to not put down the plastic vapor barrier first? I don't know the answer to that. There's information, I was correct, the appendix is 9552 to 9553. And it doesn't indicate what steps they took and what sequencing of construction that they used, but it does make very clear that each of the contractors in all of the preceding phases took contractor responsibility for their needs and methods and didn't seek reimbursement for the government. And again, we're not talking – I'm sorry, go ahead. Okay. Another question is, I seem to recall there was some view or finding, I don't know if it was a finding, that the cost and degree of remediation that those contractors had to do is not the same cost and level that JTC had to undertake. Is that right? That may or may not be. There's no evidence in the record that I'm aware of about the cost that those contractors incurred to remediate the mold. What there is evidence in the record about is the court's factual finding here that JTC's remediation was not at the direction of the government, but at its own direction. The court held that Talcott hired one hygienist company and chose to proceed with its recommendation unilaterally. The record contains no evidence of the government selecting one method over another nor expressing any preference. That's They hired one – you were correct when you were talking with Mr. Meekum earlier that they did identify the mold as being something that raised potential safety concerns, and as they are required to do in connection with the safety manual, they began proceeding with that manual immediately. And that manual requires them to hire what's called a certified industrial hygienist. They did that. They hired Mr. P. Prawn, and he assessed the mold and gave them a plan. The plan had three options. They chose Mr. Prawn, they chose that one plan, and they chose what option to follow without any input or direction of the government. And in fact, Your Honor, that's borne out no more clearly than in the cover letter to the court, which is found at 5091 of the appendix, where they indicate that they've already implemented the plan when they provide it to them. Could you explain why that makes a difference? What if, hypothetically, we were to say, well, this design is defective, so therefore it's the defective design that caused the mold problem? Why would it matter that JTC wasn't directed or ordered by the government to do the mold remediation plan? So, if the defective design caused the problem, I guess there's a couple points there. If they are design defects, you would have to demonstrate that it was the defective design specification that was the cause. And here, the trial court made a factual finding that the court and telecom cannot overcome that what caused the mold was their sequencing and not any reliance upon a purported design specification. But even assuming that was the case, they cannot say that we directed them in terms of how to proceed and how to conduct the remediation when we didn't know about the remediation until it was already implemented. We received their plan on March 1st. So, if you look at their plan, let's take a look at it. It's at page 5092 of the record. You'll see in the first paragraph, it says, it's dated February 10th. The following scope of work was started at your January 12, 2011 approval. On January 12th, that email is found at page 5184 of the record. CalCOT directed the action plan to remediate and provide future correction for potential microbial mold growth within the crawl space. And that is the direction that Crone followed in formulating its plan. We didn't receive their plan until March 1st. And that document is obviously a proceeding page here. And you can see in the cover page at 5091, they indicate JPC has started mold remediation on building 620 and will continue the process as applicable. They had received the plan and were already implementing it when it was provided to us. We didn't direct them with respect to what to do and how to remediate the mold. We did require them to remediate the mold, however. That is true because, as the trial court correctly found, homes with pervasive, vast amounts and substantial mold growth, which would have gone to the entire home, per the testimony of their own expert, as well as ours, and the admission of Mr. Talcott himself, would not have complied with the contract. Okay. Counsel, do you have anything further? If you have no further questions for me, I could address the delaying damages if you would like me to, but I believe it's unnecessary Well, I don't hear any questions, so thank you, Counsel. Let's have Mr. Meacham back up for his rebuttal time. Thank you. Yes, Your Honors. Thank you very much. In regards to the issue of the air filtering from the living units into the, excuse me, from the crawl spaces into the living units, Mr. Cron did not review the plans and specifications that was brought out in his cross-examination. In regards to the government's expert, when I asked the government's expert about this being a non-conditioned space and about the crawl spaces being sealed, he specifically said, I just don't agree with it. Well, from a contractor's perspective, you need to look at the plans and specifications, and the plans and specifications specifically say those areas are sealed off. In regards to the methodologies that were used, the judge was correct. The government gave us a directive, gave JTC a directive to remediate the mold. They selected the methodology that they considered to be the best, but it doesn't overcome the government's commitment to remediate the mold and then also to ensure that it doesn't come back. In regards to Judge Chen's comment or question about the installation of the vapor barrier, I refer you to Appendix 4921, which is the government's March 11, 2011 letter. It says, JTC shall continue to implement the recommendation provided by CTA and have CTA perform final inspections prior to installing the vapor barrier to ensure that the mold problem has been sufficiently resolved. Additionally, the government will require re-inspection of each building. So, the government was telling JTC that you have to perform this work as there's not going to be a mold issue, and we want you to do it before the vapor barrier is placed down. Now, in regards to the other phases, I think it's important for the court to understand, and this was brought up by Judge Moore, but if you look at Appendix 9567, this is where the government is reviewing the mold remediation plan, and it specifically states the USACE, Corps of Engineers, requested that the contractor submit a mold remediation plan to address the crawlspace mold problem. This is contractor's plan approved by the CIA. Note, all housing phases have experienced mold problems just like Project 7E. This was not an isolated issue. This was an issue that was pervasive and was not until specifications were issued for the Phase 7G that required the contractors to address the mold issues. I'm sorry for my overrun a little bit. No, thank you, Mr. Meacham. We thank both counsel. The argument was helpful, and this case is taken under submission. Thank you, Your Honor. Your Honor, the court is adjourned until tomorrow morning at 10 a.m. Thank you.